# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **GARY STUART** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **DAVID PIERCE,** | : | **NO. 17-934 (LFR)** |
| **et al.** | : | |
| | : | |
| | : | |

## MEMORANDUM ORDER

**L. FELIPE RESTREPO**                                                      **FEBRUARY 24, 2022**
**UNITED STATES CIRCUIT JUDGE**

Plaintiff Gary Stuart ("Stuart"), an inmate at the James T. Vaughn Correctional

Center ("JTVCC"), brought this action against Defendant David Pierce ("Pierce"), the

former warden of JTVCC, seeking compensatory and punitive damages under 42 U.S.C.

§ 1983 for alleged violations of his constitutional rights. Stuart alleges three violations: I)

deliberate indifference to his serious medical need; II) deliberate indifference to his risk

of suicide; and III) cruel and unusual conditions of confinement and a violation of his

right to due process. Before the Court is Pierce's motion to dismiss Stuart's complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6). In addition to arguing Stuart fails

to allege claims upon which relief can be granted, Pierce asserts the claims are barred by

the statute of limitations and that he is entitled to qualified immunity on all three

1

counts. For the reasons outlined in this opinion, Pierce's motion to dismiss and request for qualified immunity are denied as to Counts I and III. However, Pierce is entitled to qualified immunity as to Count II and his motion to dismiss is granted as to that claim.

## I.   Factual and Procedural Background[1]

Pierce was the warden of JTVCC from August 2013 to February 2017. Comp. ¶ 4. Stuart is presently an inmate at JTVCC and was an inmate there at all times related to this lawsuit. *Id.* at ¶ 3. For most of his life, Stuart has suffered from severe mental health issues; he has engaged in self-harm since the age of eleven and has been diagnosed with post-traumatic stress disorder, borderline personality disorder, depression, and attention deficit disorder. *Id.* at ¶ 9-10. In 2000, while incarcerated for an unrelated crime, he committed self-harm by jumping off his cell block, which led to a year and half stay in the Delaware Psychiatric Center. *Id.* at ¶ 11-12. After his release, he was again incarcerated at JTVCC in 2003 for a probation violation. *Id.* at ¶ 13. JTVCC classified Stuart as a "seriously mentally ill person" and kept him on the mental health roster. *Id.* at ¶ 14.

In April 2006, Stuart was moved to JTVCC's Security Housing Unit ("SHU") after he was convicted of murdering his cellmate. *Id*. at ¶ 15. Although inmates could earn their way out of the SHU with good behavior, Stuart would remain in the SHU for the

---

[1] The facts are summarized as taken from Stuart's Second Amended Complaint, the operative complaint.

next decade. *Id.* at ¶ 17-18. During this time, he repeatedly cut himself and even painted on the walls of his cell with his own blood. *Id.* at ¶ 20. Stuart alleges his mental health conditions were exacerbated by the small cell dimensions, the near-constant light and noise, and the lack of adequate recreation, hygiene, and rehabilitative programs in the SHU. *Id.* at ¶ 21. Most significantly, Stuart alleges he was denied adequate mental health treatment. *Id.*

Between 2006 and 2013, Stuart alleges his only access to mental health treatment in the SHU was the ability to put in a "sick call." *Id.* at ¶ 25. After making a sick call and waiting several days, Stuart could have a short, non-confidential talk with a mental health provider standing outside of his solid cell door. *Id.* These conditions allegedly took a toll on Stuart's mental health. He was placed on suicide watch in 2012 and 2013 and engaged in self-harm through his ten years in the SHU. *Id.* at ¶ 23. Stuart alleges that Pierce was made aware of these facts as the prison warden. *Id.* Outside of the SHU, prisoners in the Special Needs Unit ("SNU") had greater access to treatment, including daily access to therapy and group sessions. *Id.* at ¶ 24.

Beginning in 2013 and coinciding with Pierce's arrival at JTVCC, Stuart was afforded a marginal increase in treatment. *Id.* at ¶ 26. He received weekly visits—still non-confidential and through his solid cell door—and saw a psychiatrist every 90 days. *Id.* He alleges this treatment did little to assuage his mental health problems, and he continued to commit self-harm and have suicidal thoughts. *Id.* In 2014 and 2015, the

3

prison's Institutional Based Classification Committee ("IBCC") classified Stuart as medium security, finding that he did not need to remain in the SHU and recommending that he be transferred to a lower security unit so he could receive treatment. *Id.* at ¶ 32. On both occasions, Pierce exercised his statutory power to unilaterally "veto" Stuart's reclassification without explanation. *Id.*

Stuart also consistently advocated for his own reclassification.[2]  In October 2014, he filed a medical grievance discussing his psychological troubles and need for treatment. *Id.* at ¶ 28. He filed two more medical grievances, as well as wrote personal letters to Pierce and Deputy Warden Parker in November and December of 2015. *Id.* at ¶¶ 29-31, 33. In the November grievance, Stuart highlighted his need for confidential care and the ineffectiveness of the visits at his cell door. *Id.* at ¶ 29. In the December grievance, he wrote that he "doesn't know how much more longer he can hold on . . . suffering from a great deal of depression, stress, and a abundance of very very unhealthy thoughts." *Id.* at ¶ 31. Deputy Warden Parker responded to the letter by writing that he was declining to reclassify Stuart because of his prior murder conviction, despite his record of good behavior as recognized by the IBCC. *Id.* at ¶ 34-35. Pierce did not respond. *Id.* at ¶ 34.

Stuart remained in the SHU and, in January 2016, attempted to commit suicide

---

2  Stuart's grievance history is well documented and for that reason, the Court finds Stuart exhausted his administrative remedies as required by the Prisoner Litigation Reform Act. *See* 42 U.S.C. § 1997e(a).

by hanging himself. *Id.* at ¶ 37. Following this attempt, prison mental health professionals lobbied Pierce to reclassify Stuart. *Id.* Pierce still did not permit the reclassification until June 2016. *Id.* at ¶ 38. Despite being reclassified, Stuart alleges the toll of his decade-long stay in the SHU was severe: he attempted suicide three more times between August 2017 and August 2018 and continued to engage in self-harm. *Id.* at ¶ 39-42. After more trips to the Delaware Psychiatric Hospital and Kent General Hospital, Stuart returned to JTVCC in 2018, where he remains. *Id.* at ¶ 42, 43.

On July 11, 2017, Stuart filed his original complaint against Pierce and Warden Perry Phelps, seeking monetary relief. Def. Br. at 1. He filed his first amended complaint in February 2019, adding a request for injunctive relief. *Id.* He filed his second amended complaint, the operative complaint, in October 2019, alleging the three counts now at issue. *Id.* The basis of Stuart's complaint is that Pierce knew of his mental health needs because of, *inter alia*, the prison records of his suicide attempt, his regular self-harm at JTVCC, his requests for improved treatment, and the instances he was placed on suicide watch. Comp. at ¶ 45-54. Stuart alleges that Pierce, by keeping him in the SHU for a decade and failing to address his mental health needs, was deliberately indifferent to his health and his risk of suicide. *Id.* at ¶ 55-75. Stuart further alleges that Pierce violated his rights under the Eighth and Fourteenth Amendments by keeping him in the SHU for so long and vetoing the IBCC's reclassifications without providing him sufficient process. *Id.* at ¶ 76-84.

Defendants Pierce and Phelps moved to dismiss the complaint, and the Court granted a stipulation to dismiss all claims asserted against Defendant Warden Phelps. Def. Br. at 2. The Court denied the motion as to Pierce but allowed him to file a renewed motion to dismiss after the parties had met and conferred. *Id.* Pierce filed the renewed motion in September 2021, which has since been fully briefed. *Id.* This decision follows.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under this standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint "must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). However, the requirement that a court accept the allegations in a complaint as true "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To summarize, a court takes three steps when it considers a motion to dismiss

under the current pleading standard. First, the court "must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Second, it "should identify allegations that, because they are no more than legal conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

## III.    Discussion

Pierce's motion to dismiss raises three arguments. First, that any of Stuart's claims arising from events before July 11, 2015, are barred by the statute of limitations. Second, that each of Stuart's allegations fail to state a claim upon which relief can be granted. And finally, that Pierce is entitled to qualified immunity as a government official. These issues are addressed in that order.

### A.  Stuart's Claims are Not Barred by the Statute of Limitations

For statute of limitations purposes, § 1983 claims are treated as personal injury actions and are "governed by the personal injury tort law of the state where the action arose." *Kach v. Hose*, 589 F.3d 626, 635 (3d Cir. 2009) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)). In Delaware, § 1983 actions are subject to a two-year limitations period. *Gibbs v. Deckers*, 234 F. Supp. 2d 458, 461 (D. Del. 2002). Because Stuart filed his

complaint on July 11, 2017, claims arising from Pierce's conduct before July 11, 2015 are time-barred if this statute of limitations applies. Stuart argues, however, that the continuing violation doctrine, a narrow and equitable exception to the statute of limitations, applies here and allows him to recover for otherwise time-barred actions in this instance. This doctrine provides that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." *Barrett v. McDonald*, 2015 U.S. Dist. LEXIS 129653, at *13–14 (D. Del. Sep. 25, 2015) (quoting *Brenner v. Loc. 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991)).

At the threshold, the continuing violation doctrine is relevant here because the last acts alleged against Pierce are within the two-year limitations period, a fact Pierce concedes. Def. Br. At 8. To determine the doctrine's applicability, the Court applies a three-factor test to assess the defendants' alleged violative conduct:

> (1) subject matter jurisdiction-whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency-whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence-whether the act had a degree of permanence which should trigger the plaintiffs awareness of and duty to assert his/her rights . . ." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001).

In applying the first factor, the Court finds the actions Stuart alleges against Pierce constitute the same type of continuous violation. All of Stuart's allegations posit

that Pierce knew of his severe mental health condition yet was indifferent to the evidence of his health and affirmatively rejected numerous pleas to provide improved care. The second factor is also met: the alleged violative conduct was sufficiently frequent, rather than isolated incidents or discrete violations. Stuart alleged a pattern of conduct that cumulated in his mental health deterioration. *See O'Connor v. City of Newark,* 440 F.3d 125, 127–28 (3d Cir. 2006) (emphasizing that claims for "discrete acts" must be brought within the limitations period, but a claim for a "continuing violation" can be brought outside of the limitations period when it is based on the "cumulative effects" of a "pattern of actions which continues into the applicable limitations period"); *Brathwaite v. Phelps*, 2021 U.S. Dist. LEXIS 20996, at *7–8 (D. Del. Feb. 4, 2021) (finding the continued violation doctrine inapplicable because each alleged violation was a "discrete violation"). The Court finds that Stuart's claims are not based on isolated acts, but rather on allegations of years of indifference to his needs that continued into the applicable limitations period.[3]

The third factor, that the alleged acts had a degree of permanence, weighs whether a defendant's actions triggered a plaintiff's duty to assert their rights. A claim under § 1983 accrues "when the plaintiff knew or should have known of the injury

---

[3] The continuing violation doctrine focuses on the "affirmative acts" of the Defendant. *Cowell*, 263 F.3d at 293. Stuart alleges affirmative acts because he claims Pierce acted affirmatively by vetoing the IBCC's recommendations. Viewed in the light most favorable to Stuart, these affirmative vetoes can be seen as indicative of a pattern of alleged indifference, rather than isolated violations.

upon which its action is based." *Restrepo v. Phelps*, 2017 WL 6029584, at *2 (D. Del. Dec. 4, 2017) (quoting *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998)).[4]  In this instance, the Court finds it reasonable to believe that Stuart's claim began accruing within the two years preceding the filing of his complaint, after the years of alleged indifference resulted in cumulative injury to his mental health. Stuart could have believed his situation would improve from 2015 to 2016 with some persistence and without filing a lawsuit, given the IBCC's reclassifications and his worsening mental health. It is plausible that Stuart felt and became aware of his legal injury in 2017, shortly before he attempted suicide multiple times and was again re-hospitalized.

The Court finds that, given the nature of Stuart's allegations, the continuing violations doctrine applies in this case. Stuart alleges claims that arise out of his decade-long stay in the SHU, of which Pierce was responsible for nearly three. Because Stuart alleges a continuous pattern of deliberate indifference that resulted in a cumulative injury, applying the doctrine is appropriate. *See Anders v. Bucks Cnty.*, 2014 U.S. Dist. LEXIS 66352, at *13 (E.D. Pa. May 12, 2014) (applying the continuing violation doctrine when the "cumulative effects" of years of treatment created a cause of action for deliberate indifference to a medical need); *Johnston v. Wetzel,* 431 F. Supp. 3d 666, 676

---

4  The court in *Restrepo* dismissed a prisoner's conditions of confinement claim under § 1983 as time-barred but had no occasion to consider the continued violation doctrine because the plaintiff did not plead claims of deliberate indifference that continued into the post-limitations period, nor did he invoke this doctrine.

(W.D. Pa. 2019) (noting the "rationale underlying the continuing violation doctrine"

particularly applied to a claim based on seventeen years of treatment in solitary

confinement); *Shoatz v. Wetzel*, 2016 U.S. Dist. LEXIS 17515 (W.D. Pa. Feb. 12, 2016)

(same). Accordingly, Stuart's claims are not barred by the statute of limitations and this

Court will consider all facts alleged in his complaint to assess the viability of his claims.

### B.  12(b)(6) Pleading Sufficiency

The Court next determines whether the facts alleged by Stuart are sufficient to

state a claim that entitles him to relief and withstand Pierce's motion to dismiss.

### 1.  Count I - Deliberate Indifference to Serious Medical Need

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that deliberate

indifference to serious medical needs of prisoners violates the Eighth Amendment.

Failing to provide a seriously mentally ill prisoner with meaningful mental health care

can be the basis for a viable deliberate indifference claim under *Estelle*. *See Inmates of

Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979) (holding that a deliberate

indifference claim is actionable when prisoners "with serious mental ills are effectively

prevented from being diagnosed and treated by qualified professionals").

To state a claim for deliberate indifference to a medical need, a plaintiff must

show "(1) a serious medical need, and (2) acts or omissions by prison officials that

indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318

F.3d 575, 582 (3d Cir. 2003) (citations omitted). Because Pierce concedes that Stuart had a serious medical need, the first prong is not at issue. Def. Br. at 11. Pierce contests the second prong, claiming that Stuart failed to sufficiently allege that he acted with deliberate indifference or that his actions harmed Stuart. *Id.*

To show that a prison official was deliberately indifferent, a plaintiff must allege facts showing that prison officials knew of and "reckless[ly] disregarded a substantial risk of serious harm." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (quotations omitted). Rather than allege the defendant should have recognized the excessive risk and responded, a plaintiff must provide "evidence that the defendant must have recognized the excessive risk and ignored it." *DeJesus v. Drace*, 2021 U.S. Dist. LEXIS 138472, at *14 (D. Del. July 26, 2021) (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 138 (3d Cir. 2001)).

Viewing the factual allegations as true and in a light most favorable to Stuart, the Court finds that he alleged sufficient facts to survive Pierce's motion to dismiss on this claim. Stuart alleges Pierce knew of his mental health and self-harm history. Comp. ¶¶ 45-54. He alleges Pierce was made aware of his health, the lack of care he was receiving, and the general conditions in the SHU through his numerous letters and grievances, the IBCC's repeated attempts to reclassify him, and the pleas from prison medical personnel on his behalf. *Id.* And Stuart alleges that, despite this knowledge, Pierce vetoed the IBCC's reclassifications and disregarded pleas from medical personnel to

give him increased treatment, even after his 2016 suicide attempt. These factual allegations plausibly demonstrate that Pierce knew, recognized, and ignored the excessive risk posed to Stuart's health.

Pierce argues that Stuart's allegations only show a lack of adequate care, not deliberate indifference, because Stuart admitted to receiving some treatment and failed to allege Pierce knew such treatment was insufficient. The Court disagrees with this assessment. The fact Stuart received some care does not immunize Pierce from liability when "deliberate indifference caused an easier and less efficacious treatment to be provided" in the first place. *West v. Keve*, 571 F.2d 158, 162 (3d. Cir. 1978). The care Stuart allegedly received—minimal and sporadic contact with nurses and psychiatric workers—can be insufficient to treat a seriously mentally ill prisoner and indicate reckless disregard when that treatment is clearly ineffective. *See Inmates of Allegheny Cnty. Jail*, 612 F.2d at 762; *Clark v. Coupe*, 2019 U.S. Dist. LEXIS 50215, at *9 (D. Del. Mar. 26, 2019) ("The fact that [defendant] allowed Plaintiff occasional visits with mental health providers does not *per se* immunize [him] from liability.").

Pierce cannot prevail on his motion to dismiss simply because Stuart admitted to receiving minimal care. Stuart alleges the non-confidential visits at his cell door were inadequate to treat his extreme mental health needs. He has also alleged multiple ways Pierce would have had personal knowledge of his situation, as well as the knowledge that Stuart's treatment was completely ineffective in treating his condition. Comp. at ¶

13

45–54. Thus, Stuart has alleged both a serious medical need and Pierce's indifference to this need to survive dismissal at this stage.

### 2.  Count II - Deliberate Indifference to Risk of Suicide

Deliberate indifference to risk of suicide is a more fact-specific application of the standard discussed above. To sufficiently allege a claim for deliberate indifference to risk of suicide, a plaintiff must show:

> (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability. *Palakovic*, 854 F.3d at 223–24 (citations omitted).

Given Stuart's history, it is plain that the first element has been sufficiently alleged. Stuart had attempted suicide, routinely engaged in self-harm, and was on suicide watch at different times. Pierce argues the claim fails on the second element, that Stuart failed to allege any facts showing that he was aware or should have been aware of Stuart's particular vulnerability. Def. Br. at 17–19. To establish that an official "should have known" of a prisoner's vulnerability to suicide, the risk must be "so obvious that a lay person would recognize the necessity for preventative action." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1025, 1026–27 (3d Cir. 1991) (holding the vulnerability to suicide was not obvious where the plaintiff swallowed pills but otherwise lacked a documented history of self-harm). Stuart alleges that Pierce was

14

made aware of vulnerability to suicide in the same ways that he was made aware of Stuart's serious medical need. Stuart also alleges that, even if Pierce was unaware of his vulnerability prior to 2016, Pierce knew of his 2016 suicide attempt and refused to reclassify him for six months, despite pleas from Stuart and other health professionals to do so. These allegations satisfy the second element.

The Court also finds Stuart sufficiently alleges that Pierce acted with "reckless indifference," as required for the third element. *Palakovic*, 854 F.3d at 222. Pierce kept Stuart in solitary confinement while knowing his history of self-harm, his risk of suicide, and the conditions in the SHU, despite his complaints and the IBCC's reclassifications. Stuart alleges Pierce kept him in the SHU for six months *after* his 2016 suicide attempt, while continuing to provide him inadequate mental health treatment. Comp. at ¶ 37. For these reasons, Stuart states a claim for deliberate indifference to vulnerability of suicide. *See Palakovic*, 854 F.3d at 222 (finding sufficient allegations of deliberate indifference to suicide claim where the plaintiff was subjected to a lengthy stay in solitary, had a documented risk of suicide, and received mental healthcare only through his cell door).

### 3.   Count III - Procedural Due Process and Conditions of Confinement

Stuart's third claim is for a combination of his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to procedural due process.   When analyzing a due process claim based on a stay in

solitary confinement, the first step is to determine whether the plaintiff alleged a deprivation of his constitutionally protected liberty interest. *Shoats v. Horn*, 213 F.3d 140, 143–44 (3d. Cir. 2000). If such a deprivation is alleged, the second step is to determine whether the plaintiff received "all of the process he was due." *Id.* at 143.

A prison official can deprive an inmate of his constitutionally protected liberty interest by keeping him in solitary confinement if such a stay "impose[s] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 474, 484 (1995). To determine the significance of the alleged hardship, courts consider the length and nature of the stay in confinement. In so doing, this Court finds that Stuart's indefinite nine year stay in the SHU, without receiving adequate care for his substantial mental health needs, is sufficient to allege a hardship outside those imposed in the ordinary course of prison life. *See Shoats*, 213 F.3d at 144 (finding that eight years in solitary confinement presented an atypical hardship); *Szubielski v. Pierce*, 2018 U.S. Dist. LEXIS 176343, at *7 (D. Del. Oct. 15, 2018) (finding that nearly nine years in solitary was sufficient to allege an atypical hardship at the motion to dismiss stage).[5]

_____

5 *Szubielski*, a case discussed by both parties, is instructive. Pierce argued in *Szubielski* that he was only responsible for a single year of the plaintiff's confinement, the year after his arrival at JTVCC in 2013. *Id.* at 6. The court found that Pierce could not "place his actions in a vacuum," but was instead responsible for the plaintiff's "continued confinement," which Pierce knew was ongoing for almost nine years. *Id.* Here, as in *Szubielski*, Stuart's allegations that Pierce kept him in solitary for over three years despite knowledge of his mental health problems and his previous six years in solitary

Having found Stuart sufficiently alleged an atypical and significant hardship, the Court must determine whether Stuart alleged that he did not receive the process he was due. *Shoats*, 213 F.3d at 143. In *Shoats*, the Third Circuit held a prison must provide a prisoner with an opportunity to present an "informal, non-adversary review" to "the prison official charged with deciding" his status. *Id.* at 145 (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)). Here, Stuart alleges he was not given the opportunity to present a meaningful review to Pierce, who had the ultimate authority to remove Stuart from the SHU, because Stuart alleges Pierce vetoed the IBCC's reclassification and kept him in the SHU before he filed grievances and sent Pierce letters. Given Stuart's lengthy stay in solitary and the absence of opportunity for meaningful review, this Court finds that he has alleged grounds to be entitled to "some amount of process for continued detention." *Szubielski*, 2018 U.S. Dist. LEXIS 176343, at *7.[6]

Thus, Stuart alleges enough facts to state a claim on Count III. Whether he faced an atypical hardship and received inadequate process for his continued detention in solitary should be answered with discovery.

**C. Pierce is Entitled to Qualified Immunity on Count II, but not Counts I and III.**

Having found that Stuart has adequately pleaded his claims to survive dismissal,

---

suffice to plead a significant and atypical hardship.

[6] Although the plaintiff in *Szubielski* filed numerous grievances and letters, as Stuart did here, the court found that it remained a factual question whether he received adequate process. *Id.* at 7.

the Court turns to Pierce's assertion that he is entitled to qualified immunity. Generally, the doctrine of qualified immunity shields a government official who is sued in their individual capacity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *George v. Rehiel*, 738 F.3d 562, 571–72 (3d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity inquiry has two prongs: (1) whether the facts alleged show a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the violation. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010).

Because it has already been determined that Stuart alleges viable claims of constitutional violations, this analysis focuses on the second prong—whether Stuart's rights were clearly established at the time of the alleged violation. Such a determination also requires a two-part inquiry: first, the Court must define the right "in light of the specific context of the case, not as a broad general proposition." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Second, the Court must determine whether the right was clearly established at the time of the alleged violation, i.e., whether the right was "sufficiently clear that a reasonable official would understand what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Initially, the Court rejects Pierce's contention that Stuart defined the violated rights too broadly. Def. Rep. Br. at 3–4. The Court adopts Stuart's narrower framing of

18

the violation as it pertains to the first two claims, that "defendant was aware of the plaintiff's serious mental illness . . . [and] deprived the plaintiff of 'any meaningful mental health treatment.'" P. Answ. Br. at 13. Thus, the Court finds Stuart has alleged a recognizable right of a prisoner to receive meaningful mental health treatment and suicide prevention care where the defendant prison official knew of their serious mental illness, their history of self-harm, and their documented risk of suicide. Further, Stuart has sufficiently alleged that his constitutionally protected liberty interest was violated by his lengthy stay in solitary despite his serious health needs, and that he did not receive the process he was due because Pierce made the decisions to keep him in solitary without providing Stuart an opportunity for review.

Finding that Stuart alleged his constitutional rights with sufficient specificity, the Court must now determine whether these rights were clearly established when they were allegedly violated. In so doing, this Court first looks to factually analogous precedent from the Supreme Court and the Third Circuit, then considers whether there is a "robust consensus of cases of persuasive authority" from Courts of Appeals and district courts. *Fields v. City of Phila.*, 862 F.3d 353, 361 (3d Cir. 2017) (quoting *L.R. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016)). In examining the case law, the Court is mindful that the Third Circuit has instructed courts to take a "broad view of what constitutes an established right." *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004) (quotations omitted). Indeed, a right may be deemed clearly established even without a

19

"'precise factual correspondence' between the case at issue and a previous case." *Id.*
(citation omitted); *see also Ashcroft*, 563 U.S. at 741 ("We do not require a case directly on
point, but existing precedent must have placed the . . . constitutional question beyond
debate.").

A consensus of cases establishes that the rights allegedly violated in Counts I and
III of Stuart's complaint were clearly established at the time of the alleged violations.
The right to medical care when incarcerated under conditions that pose a risk of serious
harm traces back to the Supreme Court's holding in *Estelle,* where the Court held that
denying a prisoner adequate medical care violates the Eighth Amendment. *Estelle*, 429
U.S. at 104; *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994 (holding deliberate
indifference claims viable under the Eighth Amendment when prisoners are
"incarcerated under conditions posing a substantial risk of serious harm").

The Third Circuit has held that mental health treatment falls within the scope of
medical care as defined by *Estelle*. *See Inmates of Allegheny Cnty. Jail*, 612 F.2d at 763
(holding failure to provide treatment to a prisoner with mental illness can be deliberate
indifference); s*ee also Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (holding
deliberate indifference "appl[ies] to physical, dental, and mental health"). Additional
caselaw from the Third Circuit and other circuits establishes that a mentally ill
prisoner's access to adequate mental health treatment is an established right. *See
Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 111 (3d Cir. 2007) (holding that the

plaintiff's mental illness created a serious medical need requiring treatment beyond that available in solitary); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977) (holding that a prisoner with serious mental illness "is entitled to psychological or psychiatric care"); *Doty v. County of Lassen* 37 F.3d 540, 546 (9th Cir. 1994) ("[R]equirements for mental health care are the same as those for physical health care needs."); *Langley v. Coughlin*, 715 F.Supp 522, 540 (S.D.N.Y. 1988) (holding that failing to screen out mentally ill individuals from SHU can plausibly violate the Eighth Amendment). Because the right to meaningful mental health care was clearly established at the time Stuart alleges the violations occurred, the Court finds that Pierce is not entitled to qualified immunity on this claim.

As for Count III, the Supreme Court and Third Circuit have held that lengthy stays in solitary confinement can violate prisoners' Eighth and Fourteenth Amendment rights. *See Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 223–24 (2005); *Shoats*, 213 F.3d at 145. It is established that a stay in solitary can violate a liberty interest if it imposes a significant and atypical hardship. *Shoats*, 213 F.3d at 145. Several circuits have held that that a lengthy, indefinite stay in solitary confinement can be an atypical hardship and trigger a clearly established right to due process regarding the continued detention. *See, e.g.*, *Hanrahan v. Doling*, 331 F.3d 93, 99 (2d Cir. 2003) (per curiam) ("ten years of solitary confinement [] triggered due process protection"); *Wilson v. Goodwin*, 774 F.3d 845, 856 (5th Cir. 2014) (holding the right to review regarding an indefinite,

forty year stay in solitary to be clearly established). Here, Stuart's due process right to present his views to Pierce was clearly established. *See Johnson v. Anderson*, 370 F. Supp. 1373, 1382 (D. Del. 1974) (finding that prison officials violated a prisoner's due process rights by keeping him in solitary confinement indefinitely and without a meaningful opportunity to present their views); *but see Burns v. Swenson*, 430 F.2d 771 (8th Cir. 1970) (holding no due process violation where a prison warden personally wrote and had multiple conversations with a prisoner about his continued detention). Accordingly, Stuart's liberty interest and the right to process was clearly established at the time of the alleged violation, rendering Pierce's claim that he is entitled to qualified immunity unpersuasive.

The Court finds that the right to suicide prevention care under Count II is not a clearly established right, however. The Third Circuit held in *Colburn* that when a prison official does "know or should know of the particular vulnerability to suicide of an inmate," they have an obligation "not to act with reckless indifference to that vulnerability." *Colburn*, 838 F. 2d at 669. Applying *Colburn*, the Third Circuit held that the right to suicide prevention procedures was a clearly established right for patients with a document risk of suicide. *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 329 (3d Cir. 2014). But the Supreme Court reversed this decision, holding that there was no established right to "minimum screening procedures or prevention protocols" for inmates with a risk of suicide. *Taylor v. Barkes*, 575 U.S. 822, 827 (2015) (per curiam).

Given the state of the law at the time of alleged violation, the court finds that Stuart cannot point to a weight of precedent to show that Pierce had "fair warning" that he was violating Stuart's right to suicide prevention care. *Hope v. Pelzer*, 536 U.S. 730, 740 (2002). While the care provided to Stuart was not adequate to treat his mental health needs, Stuart was placed on suicide watch and prevented from taking his own life. Because the Supreme Court held in *Taylor* that the right to specific suicide prevention procedures was not clearly established in 2015, the Court cannot find that Pierce was aware of the right to such procedures in 2014–15, nor can it find that Pierce should have been aware of violating Stuart's right by failing to implement certain additional procedures.[7]  Accordingly, the Court finds that Pierce was not on clear notice at the time of his actions that he may have violated a constitutional right, and he is therefore entitled to qualified immunity on this claim.

## IV.    Conclusion

For the foregoing reasons, Pierce's Motion to Dismiss Counts I and III of Stuart's complaint is DENIED. Pierce is entitled to qualified immunity as to Count II and his motion is GRANTED as to that count.

---

[7] The Court notes that, given recent decisions, the right to suicide prevention care may be a clearly established right. *See Palakovic*, 854 F.3d at 230–31 (recognizing a deliberate indifference to suicide claim where the plaintiff had a documented history of self-harm and suicide attempts). But Pierce's actions occurred during 2013-16, a period in which the Supreme Court held that the alleged right was not clearly established.

Entered this 24th day of February, 2022

s/ L. Felipe Restrepo

United States Circuit Judge